UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TIM HOLT, TDOC # 351550      )
                             )
v.                           )        NO. 2:06-CV-247
                             )
HOWARD CARLTON, Warden       )

## MEMORANDUM OPINION

Proceeding *pro se*, state prisoner Tim Holt brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement. Respondent has moved for dismissal and petitioner has filed a response in objection. [Docs. 10, 15]. For the reasons which follow, respondent's motion will be **GRANTED** and the petition will be **DISMISSED**.

### I. **Procedural History**

In 2002, petitioner was convicted of first-degree murder by a jury in the Criminal Court for Hancock County, Tennessee and sentenced to a life-term in prison. Petitioner was unsuccessful on direct appeal, *State v. Holt*, No. E2002-02471-CCA-R3-CD, 2003 WL 22703233 (Tenn. Crim. App. Nov. 7, 1994), *perm. app. denied* (Tenn. 2004), and in petitioning for post-conviction relief. *Holt v. State*, No. E2005-00587-CCA-R3-PC, 2006 WL 211795 (Tenn. Crim. App. Jan. 27, 2006), *perm. app. denied* (Tenn. May 1, 2006). He

now brings this federal petition for a writ of habeas corpus, asserting two grounds for relief: insufficient evidence and ineffective assistance of counsel.

## II. **Factual Background**

The following factual summary is taken from the state appellate court's opinion during petitioner's direct review:

> This case relates to the defendant's killing William Marshall Haas on August 21, 2001. At trial, Jane Turnmire testified that on that date, she saw a car off the road as she drove on Highway 131. She said that when she approached the car, she saw a man inside who was bleeding and struggling to breathe. She said that his pulse was weak and that he quit breathing about two minutes after she arrived. On cross-examination, she said that there was a truck driver at the roadside when she arrived but that he did not approach the victim's car. She said that blood was on the steering wheel, the floorboard, and the dash but that she did not see much blood on the passenger side of the vehicle. She said she did not see the defendant while she was at the victim's car.
>
> Scotty Ferguson, a special agent for the Tennessee Bureau of Investigation, testified that when he arrived at Highway 131, he saw the victim inside a blue Subaru Brat parked about one-hundred thirty-five feet north of the highway. He said he saw a gunshot wound near the left eye of the victim and a bullet hole behind the door of the victim's car. He said that he had no suspects at that time but that he arrested the defendant later based on information he received from the defendant's wife and daughter.
>
> Ferguson testified that the defendant agreed to make a statement and that in the statement, the defendant said he drove up from behind the victim, shot him, and then drove away from the victim. He said that he did this to protect his family and that people had been prowling around his yard at

night. He said that he called the police but that they would not help him. He said that he saw the victim drive by his house every day and that he believed the victim may have killed others. The defendant said God wanted him to kill the victim to protect his family.

Randy Surgenor testified that he was driving his logging truck around a corner when he saw two cars driving beside each other. He said both he and the other two cars were traveling west on Highway 131. He said he saw one car veer off the road even though the two cars never collided. He said the other car was a light-colored car and continued west on the highway after the first car veered off the road. He said he called 9-1-1 at that time. On cross-examination, he said he never heard a "pop" or a "blast" and did not see a weapon in the car that continued on the highway. He acknowledged that although he stopped, he never approached the car that had veered off the road.

Dolly Faye Holt, the defendant's wife, testified that the defendant began using methamphetamine in early 2000. She said that in August 2000, the defendant began to think the police were watching them and believed the victim was an undercover agent who was trying to catch them using drugs. She said she tried to convince the defendant that the victim was just passing their house to deliver newspapers. She said that on August 21, 2001, she was returning from work around eight o'clock in the morning when the defendant told her that people were watching them and trying to tear their family apart. She said that the defendant left around eleven that morning, taking a shotgun with him. She said that later that evening she heard that the victim had been shot and asked the defendant if he was involved. She said he did not say anything at first but later admitted to her and her daughter that he shot the victim. She stated he said he shot the victim because the victim was trying to tear the family apart. She said the defendant asked her not to tell anyone that he shot the victim. She said that later, while he was in jail, he told her that he had help in the shooting.

On cross-examination, she said that the defendant believed several items in their house were "bugged" and that people were prowling around their yard at night. She said the defendant shot at their outbuilding once because he believed he heard people on their property. She said he also claimed someone had taken their outbuilding apart and then nailed it back together. She said that she never saw or heard anyone on their property and that she tried to convince the defendant that there were no "bugs" in their house. She said she heard Mike Mathis, an acquaintance of the defendant, tell the defendant in reference to the victim that if the victim was watching his family, he would kill him. She said she also heard Mathis tell the defendant that the victim was using the newspaper route as a cover.

Russell Davis, a special agent for the Tennessee Bureau of Investigation, testified that a gunshot hole was in the victim's car's door and that gunshot residue was on the victim, indicating the victim was shot at close range. Terri Arney, also a special agent for the Tennessee Bureau of Investigation, testified that the defendant's shotgun was functional. Dr. Ellen Wallen, a forensic pathologist, testified that the victim died of a gunshot to the face and that the victim was looking to his left when he was shot.

Dr. Eric Engum, a clinical neuropsychologist, testified that he met with and performed tests on the defendant for fifteen hours in February 2002. He said that although he found no brain damage, he concluded that the defendant was mildly mentally retarded. He said that based on the defendant's test results, he also diagnosed the defendant as being paranoid. He said, however, that the defendant was competent to stand trial, that he understood his *Miranda* rights, and that he was not insane at the time of the murder. On cross-examination, he said the defendant's drug abuse may have been a causal factor in the defendant's paranoia. He said the defendant understood the difference between right and wrong. He said the defendant lied to him about the killing, which indicated that the defendant was capable of premeditation.

> The defendant testified he was thirty-six years old, married, had a second grade education, and could not read or write. He said he did not believe he had mental problems but admitted abusing drugs in August 2001. He said that at that time, people were prowling around his property and that he noticed things were out of place. He said he shot at the outbuilding and yelled at whomever was on his property to keep them away from his wife and child. He said he knew his home was "bugged." He said that someone was watching him during August 2001 but that he did not know who it was. He said that he first thought that it was people using drugs who were watching him but that he later believed it was the police.
>
> The defendant testified that he did not know that the victim was a constable until after he shot him. He said Mathis convinced him that the victim was an undercover agent who was trying to catch him using drugs. He said he was not on drugs the day he shot the victim. He said he followed the victim for three miles, pulled beside the victim's vehicle, and shot him. He said that when he shot the victim, he was only trying to scare him and that he was aiming for the bed of the victim's truck. He said that after the shooting, he threw the shells and the casings from the gun out the window and went to Mathis' house but did not tell him about the shooting. He said that when he arrived home, he mowed his yard. On cross-examination, he said that his statement to police was incorrect because he never told the police that God told him to shoot the victim. He said he told the police that God told him to protect his family. Based upon this testimony, the jury convicted the defendant of first degree, premeditated murder.

*State v. Holt*, 2003 WL 22703233, *1 -3 (Tenn.Crim.App., Nov. 17, 2003).


III. **Discussion**

Petitioner's claims were offered first to the state courts, thus, he has exhausted his state court remedies, as required by 28 U.S.C. § 2254(b)(1), and the claims are properly before the Court.

A. *Insufficient Evidence*.

In his challenges to the sufficiency of the convicting evidence, petitioner first argues that the proof as to whether the homicide was accidental or a deliberate killing was conflicting at best. [Pet., at 6]. To support that the killing was not intentional, petitioner points to the forensic pathologist's testimony, in which he stated that the single bullet which killed the victim was not a direct shot, but had first hit the backside panel of the victim's truck. [Doc. 15, Pet'r's Resp.].[1] He also alleges that evidence of premeditation was lacking, since the only direct evidence was offered by petitioner himself and since he testified that he shot at the victim's truck in order to scare the victim because he believed the victim was spying on him and his family.

In addition, according to petitioner, there was uncontested proof that he suffers from paranoia and is mentally-retarded. Petitioner takes the position that, given the lack of evidence to prove premeditation, his offense should be reduced to second-degree murder. Finally, he asserts that, by failing to properly consider all the evidence presented at trial, the

---

[1] Because the petition was not as detailed as petitioner's response to the dispositive motion and because *pro se* pleadings must be liberally construed, *Haines v. Kerner*, 404 U.S. 519 (1972),the Court has viewed the arguments contained in both documents as framing his first ground for relief.

state court's adjudication of his claim is contrary to or an unreasonable application of Supreme Court precedent under §§ 2254(d)(1) and (2).

The statute to which petitioner refers contains the habeas review standards. *See* 28 U.S.C. 2254(d). Under these standards, a district court may not grant a writ of habeas corpus for any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that rested on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). A state court's determination of a factual issue shall be presumed to be correct and this presumption can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). Credibility findings made by state courts are entitled to the presumption of correctness. *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990).

On appeal, petitioner claimed that there was insufficient evidence of premeditation, given that he was only trying to scare the victim and that his mental impairment negated his ability to act with premeditation. In addressing these issues, the Tennessee Court of Criminal Appeals first observed that its review would be governed by *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The state court then discussed the statutory definition of premeditation, pointing out that this element, which may be established by evidence of the circumstances surrounding the killing, is a question for the jury. *State v. Holt*, 2003 WL 22703233, at *4. According to the state court, included in such

circumstances are the use of a deadly weapon on an unarmed victim, the cruelty of the killing, a defendant's statements of an intent to kill, procurement of a weapon, pre-offense preparations to conceal the killing, and a calm demeanor immediately afterwards.

Next, the state court delineated the proof adduced at trial to show premeditation. The jury heard evidence that petitioner thought the victim was an undercover agent, who was trying to tear his family apart; that on the day of the murder, petitioner armed himself, waited for the victim to drive by his house, followed him for three miles, pulled beside the unarmed victim, and shot him in the face at close range; that, after the shooting, petitioner did not stop to check on the victim but, instead, drove away, tossing shells and casings out of his window; and that he returned home and began mowing his yard. Moreover, petitioner later told his wife that he shot the victim, but asked her not to tell anyone.

Concluding that the jury heard petitioner testify that he was only attempting to frighten the victim, but chose to believe the prosecution's witnesses whose testimony supported that he waited for the victim, followed him, and shot him, intending to kill him, the state appellate court found the evidence sufficient to sustain petitioner's conviction for premeditated first-degree murder.

As the state court correctly indicated, *Jackson* provides the controlling legal rule for this issue. *See Gall v. Parker,* 231 F.3rd 265, 287-88 (6th Cir. 2000). *Jackson* holds that evidence, when viewed in the light most favorable to the prosecution, is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *Jackson*, 443 U.S. at 319. Thus, because the state court relied upon the relevant Supreme Court precedent, the state court decision is not contrary to *Jackson*. The question is whether the state court's conclusion is an unreasonable application of *Jackson*. It was not.

Insofar as the Court can discern, this issue primarily involves two competing versions of the circumstances surrounding the killing and the jury's obvious acceptance of the version offered by the witnesses who supported the State's theory of the case. A jury is free to choose which version of a contested issue is true. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

In view of the proof in the record showing premeditation (i.e., that petitioner armed himself with a shotgun, waited for the victim to drive by his residence, followed him some distance, pulled beside him, shot him in the face at close range, and that he [petitioner] then returned home, discarding shells and casings out the car window while enroute, and began to mow his yard—unchallenged state court factual findings which are presumed to be correct), and because this issue is one for the jury to decide, the state court's resolution of this claim was not an unreasonable application of the *Jackson* standard nor based on an unreasonable determination of the facts. Since petitioner's claim of insufficiency of the evidence does not pass either of § 2254(d)'s tests, the claim entitles him to no relief.

B. *Ineffective Assistance*.

Petitioner asserts in his petition, as he did in his state post-conviction petition, that his trial attorney gave him ineffective assistance, in that he failed to properly interview

9

defense witnesses, to advise petitioner of his right to testify, to conduct ballistic tests on the alleged weapon, to properly pursue a change of venue motion after filing it, and to object to a void indictment. The Court will examine separately each alleged attorney shortcoming and will assume that each illustration of ineffective assistance claim is supported by the same factual allegations as supported it in state court.

1. *Interview Defense Witnesses*: Petitioner claims that certain key witnesses were not interviewed by his attorney, even though they might have shed light on either alleged death threats made against petitioner and his family by methamphetamine dealers or death threats made against his trial counsel and his office staff.

When this issue was entertained by the Court of Criminal Appeals, that court referenced the post-conviction court's findings that, in preparing the defense, trial counsel and his team had left no stone unturned and no strategy or theory uninvestigated, had regularly communicated with petitioner, and had spent hours discussing every possible strategy, piece of evidence, witness, avenue of investigation, motion, plea bargain, and anything else that could be pursued.

To those findings, the Court of Criminal Appeals added its own. It reasoned that, since petitioner had failed to produce the witnesses who should have been interviewed, to identify them, or to offer any proof as to what they would have testified had they been called, it could not conclude that their testimony would have affected the outcome of the trial. Thus, the state appeals court rejected petitioner's claim because it found no prejudice from

the alleged attorney error and nothing in the record to undermine the lower court's [implied] determination of no deficiency of performance.

The relevant legal rule governing a claim of ineffective assistance is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish such a claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Id.* at 687. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 694. To demonstrate deficient performance, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* at 688, 693-94. To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different *Id.* at 694. A finding of no prejudice provides an adequate ground for rejecting an ineffective assistance of counsel claim, even if a deficient performance is assumed. *Id.* at 687.

In considering petitioner's claims of attorney mistakes, the Tennessee Court of Criminal Appeals cited to *Strickland*, as did the post-conviction court, and also to *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)—a case which holds that a petitioner who claims ineffective assistance must show that counsel's advice or services fell below the range of competence demanded of attorneys in criminal cases. Since *Baxter*'s analysis is the equivalent of the performance-prong of the *Strickland* test, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court. The

question then becomes whether the state court unreasonably applied *Strickland* in deciding this claim. It did not.

The factual conclusions reached by the state appellate court, following its review of the record, will be presumed correct, *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Matta*, 449 U.S. 539, 546-47 (1981)), as will the post-conviction court's findings of fact because petitioner has offered no clear and convincing evidence to contradict them. The post-conviction court's finding that defense counsel throughly investigated and discussed every possible strategy, piece of evidence, witness, avenue of investigation, motion, plea bargain, and anything else that could be pursued was not an unreasonable determination of the facts. And, the state appeals court's finding that there was no proof of prejudice, combined with the lower court's [implicit] determination of "no deficient performance," and the higher state court's subsequent rejection of this ineffective-assistance claim did not result from either an unreasonable factual determination in light of the evidence before it or an unreasonable application of the controlling legal principles in *Strickland.*

2. *Right to Testify*: Petitioner asserts that counsel did not inform him of his constitutional right to testify or not to testify and that he testified because his lawyer wanted him to do so.

The Court of Criminal Appeals, in resolving this claim, recounted trial counsel's testimony at the post-conviction hearing, to wit, that petitioner insisted on going to trial and telling his story to the jury; that he had explained petitioner's right in great detail;

12

and that he had prepared a written document, which was written in a way that petitioner could understand [petitioner was illiterate, but could sign his name], was signed and acknowledged by him, and was read it to him word-for-word before he signed it.[2] Prior to taking the stand, petitioner had also been questioned by the trial court, upon counsel's request, regarding his right to testify. Concluding that nothing in the record suggested that the decision to testify was not made personally by petitioner and pointing out that petitioner had admitted that, before he testified, the trial court had reviewed his right with him, the appeals court found the issue to be without merit.

A criminal defendant's right to testify in his own behalf is essential to the due process of law. *Rock v. Arkansas*, 483 U.S. 44, 50 (1987). Therefore, the right to testify may only be waived by the defendant. *See Jones v. Barnes*, 463 U.S. 745 (1983). As noted, to demonstrate that counsel was ineffective for depriving him of his right to testify, petitioner must prove his counsel's performance was deficient and the deficiency was prejudicial. *Strickland*, 466 U.S. at 687.

---

[2] According to the post-conviction transcript [Addendum No. 2, at 26], the document is entitled, "Memo from Tim Holt to Tim Eichelman" [petitioner's trial counsel], and reads, as follows: 1. I will not plead guilty in my case. 2. I know the evidence in my case makes it look like I'm guilty. 3. I did fire the shotgun which killed Mr. Haas. 4. And I was alone. 5. However, I want the jury to understand why this happened. 6. I know I can refuse to testify in my trial. 7. I want to testify in my trial. 8. My attorney has told me the law and answered my questions. 9. my attorney has showed me the evidence in this case and answered my questions. 10. I just want people to understand what was happening to me. 11. I will not plead guilty. I do not want to discuss saying that I am guilty. I want a trial. I want people to understand why this happened.

In view of the testimony presented by petitioner's lawyer at the post-conviction hearing, the document signed by petitioner acknowledging that he knew he could refuse to testify, and the trial court's voir dire of petitioner to ensure that he understood his testimonial rights, the state court's conclusion (i.e., that the alleged attorney error involving petitioner's right to testify or not to testify lacked merit and did not justify relief) was neither based on an unreasonable determination of the facts nor an unreasonable application of *Strickland*.

3. *Ballistic Testing*: In this claim, petitioner asserts that counsel failed to properly administer and/or conduct ballistic tests on the alleged weapon used in the homicide.

When this claim was raised on appeal, the Court of Criminal Appeals observed that petitioner's trial attorney had employed a firearms expert to investigate the case and that the expert identified the weapon recovered as the murder weapon based on its shot pattern, which "fit with the evidence." Moreover, petitioner himself had testified at trial that the shotgun admitted into evidence was the weapon he had "used to shoot on August 21st, 2001."

The state appellate court did not grant relief because the record disclosed nothing to undermine the post-conviction court's determination that trial counsel had done everything possible with respect to this issue and that there was no suggestion as to what more he could have done.

Once again, petitioner has not shown any deficiency of performance or any prejudice resulting from counsel's alleged shortcoming. Therefore, the state court did not unreasonably determine the facts before it nor unreasonably apply *Strickland* in so finding..

4. *Change of Venue*: Petitioner finds fault with counsel's failure to pursue a change of venue, despite the fact that he filed a motion to extend the time to file a motion for a change of venue, and with his subsequent withdrawal of the motion.

During the post-conviction hearing, counsel spoke to this issue, explaining that there was "no real basis to ask for a change of venue," that, as a matter of personal preference, he liked Hancock County juries, and that he felt that a fair trial could be obtained in Hancock County, due to its size and the lack of a single major news media sending out a daily barrage of publicity, which tends to pollute juries. The post-conviction court denied relief, finding that the jury selection process disclosed that petitioner had obtained a fair jury.

When this claim was carried to the Court of Criminal Appeals, that court observed that petitioner's lawyer, though aware of possible venue problems, decided that there was no reason to pursue the issue and, after characterizing the lower court's finding [i.e., that jury obtained in Hancock County had been fair] as a "no prejudice" finding, concluded that the issue was groundless since petitioner had submitted no proof to countermine the determination of "no prejudice," ensuing from counsel's alleged mistake.

15

As discussed, the state appellate court's finding that petitioner offered no proof of prejudice is a factual finding, which is presumed correct. *Brumley*, 269 F.3d at 637. Given this factual finding, the state court did not unreasonably determine the facts before it or unreasonably apply *Strickland* when it rejected petitioner's claim that his attorney's decision not to pursue the pretrial motion for a change of venue amounted to ineffective assistance. *Strickland*, 466 U.S. at 687 (holding that a court which finds no prejudice need not address the "deficient performance" aspect of an ineffective-assistance claim).

5. *Void Indictment*: According to petitioner, the indictment included the word, "deliberately," even though "deliberately" was not an element of a first-degree premeditated murder. The Court of Criminal Appeals found the issue to have been waived and, alternatively, lacking in merit. Respondent asserts that petitioner forfeited review of the claim by virtue of the state court's finding of waiver.

A petitioner who has presented his federal claim to the state courts, but those courts have declined to address it, due to his failure to meet a state procedural requirement, has committed a procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). Under case law in this circuit, when procedural default is claimed, a court must determine: 1) whether there is a procedural rule which applied to a petitioner's claim and whether he complied with the rule; 2) whether the procedural rule was actually enforced against him; 3) whether it is an adequate and independent state ground sufficient to block habeas review; and 4) whether a petitioner can demonstrate cause for his failure to comply with the rule and prejudice resulting from the alleged constitutional violation. *Maupin v. Smith*, 785 F.2d 135,

138 (6th Cir. 1986). If a state court denies a claim on the basis of a state procedural rule and, alternatively, on the merits, the claim will be considered procedurally defaulted. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

In Tennessee, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). Waiver supplies an adequate and independent state law ground which will bar habeas review, unless petitioner demonstrates cause and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Nothing has been offered to satisfy this requirement and, thus, habeas corpus review cannot be had with respect to this claim.

## IV. Conclusion

Respondent's motion to dismiss [Doc. 10] will be **GRANTED** as to all claims. Petitioner is not entitled to an evidentiary hearing, and his § 2254 petition [Doc. 2] will be **DISMISSED**.

## VII. Certificate of Appealability

Finally, the Court must decide whether to issue a certificate of appealability (COA). Petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that

reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims. *See Slack v. McDaniel*, 529 U.S. 473 (2000). The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), and will **DENY** issuance of a COA as to all claims. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate judgment order will enter.


**ENTER**:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE